IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CLARE R. JABLONSKI,      )
                                 )
        Plaintiff,       )
                                 )
vs.                             )          Case No. 2:16-cv-670-TMP
                               )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                               )
        Defendant.      )

## MEMORANDUM OPINION

### I.    Introduction

The plaintiff, Clare R. Jablonski, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Ms. Jablonski timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 626(c).

Ms. Jablonski was 24 years old at the time of the Administrative Law Judge's ("ALJ's") decision, and she has at least a high school education.[1] (Tr. at 96). Her past work experience is as a campus police officer at Pennsylvania State University. (Tr. at 187). Ms. Jablonski claims that she became disabled on August 20, 2012, due to bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), sleep apnea, and asthma. (Tr. at 186).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he or she is, the claimant is not disabled and the evaluation stops. *Id.* If she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id.* The decision depends upon the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If

---

[1] There are references in the record to her having completed three years of college at Pennsylvania State University, with a double major in criminal justice and sociology.

the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. pt. 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, she will be found disabled without further consideration. *Id.* If she does not, a determination of the claimant's residual functional capacity ("RFC") will be made and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite his or her impairments. 20 C.F.R. § 404.1545(a).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if she can

do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden of demonstrating that other jobs exist which the claimant can perform is on the Commissioner; and, once that burden is met, the claimant must prove her inability to perform those jobs in order to be found to be disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Jablonski has not been under a disability within the meaning of the Social Security Act from the date of her application through the date of her decision. (Tr. at 97). The ALJ determined that Ms. Jablonski has not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 90). According to the ALJ, claimant's bipolar disorder, ADHD, sleep apnea, schizoaffective disorder, PTSD and personality disorder are considered "severe" based on the requirements set forth in the regulations. (*Id.*) She further determined that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 91). More specifically, the ALJ determined that the severity of the mental impairments, considered singly and in combination, did not meet or medically equal Listings 12.04, 12.06, or 12.08. (*Id.*) The ALJ further

considered whether the criteria of "paragraph B" were met, but determined that the claimant's mental impairments did not cause at least two "marked" limitations, and did not result in "repeated" episodes of decompensation of extended duration. The ALJ went on to evaluate the "paragragh C" criteria, finding that the claimant had not demonstrated the "inability to function" outside of a highly supportive living arrangement for a year or more, and had not shown the evidence of, or likelihood of, repeated decompensation episodes that would satisfy the "paragraph C" requirement. (Tr. at 91).

The ALJ did not find Ms. Jablonski's allegations to be totally credible (Tr. at 94), and she determined that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. (Tr. at 92). The ALJ further found that the claimant should be subject to the following non-exertional limitations: that she can understand, remember, and carry out simple instructions; she can maintain attention and concentration for two-hour periods at a time; she can perform jobs that do not require interacting with the general public; she can have occasional and casual interaction with coworkers; she can make simple work-related decisions; she can adapt to routine and infrequent workplace changes; and she can perform jobs that do not require a production pace. (Tr. at 92).

According to the ALJ, Ms. Jablonski does not have any past relevant work; she is a "younger individual age 18-49" at the date of application, and she has at least a high school education and is able to communicate in English, as those terms are defined by the regulations. (Tr. at 95-96). She determined that "transferability of skills is not material to the determination of disability" in this case. (Tr. at 96). The ALJ found that there are a significant number of jobs in the national economy that she is capable of performing, such as laundry worker, night cleaner, and cleaner/housekeeper. (*Id.*) The ALJ concluded her findings by stating that the claimant is "not disabled" under the Social Security Act. (*Id.*)

Following that decision, Ms. Jablonski requested that the ALJ reopen her case on the basis of new and relevant evidence, and submitted a letter written by Dr. Romaine Hain and Stewart Evans, LPC. The ALJ declined, and the claimant filed a request for review to the Commissioner's Appeals Council. The Appeals Council denied the request for review. Ms. Jablonski then filed this appeal from the final decision denying her claims.

## II.    Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is

substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d

622, 624 (11th Cir. 1987).   Moreover, failure to apply the correct legal standards is grounds for reversal.   *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III.   Discussion

Ms. Jablonski alleges that the ALJ's decision should be reversed and remanded because the ALJ failed to give proper weight to her treating psychiatrist's opinion and substituted her own opinion for the doctor's opinion.   (Doc. 12, pp. 5-11).   She further asserts that the ALJ erred in refusing to reopen the case after Dr. Hain submitted a letter in support of Ms. Jablonski's application in September of 2014, and that the Appeals Council failed to explain its failure to grant the application in light of Dr. Hain's letter.   The Commissioner has replied that the ALJ properly evaluated the medical evidence, evaluated the claimant's RFC in accordance with the regulations, and reached a conclusion that is supported by law. (Doc. 13).   The Commissioner further asserts that the Appeals Council properly denied review because, even considering the September letter, the ALJ's decision is supported by substantial evidence.

## A.  Medical History

In order to put the ALJ's decision into context, the history of Ms. Jablonski's treatment for mental illness must be reviewed.[2]  Ms. Jablonski was diagnosed with bipolar disorder in 2007, when she was 17 years old.  At the time, she was living with her mother and siblings in Pennsylvania, after relocating with the family from Virginia. She was regularly treated in Pennsylvania by Dr. Candace R. Good, a psychiatrist, from 2007 until 2012.   (Tr. at 333-61).   Dr. Good prescribed medications for bipolar disorder and ADHD, and also provided therapy.   While living in Pennsylvania, Ms. Jablonski attended college and worked as a campus police officer at Pennsylvania State University.  She lived independently in an apartment with a roommate for about three years.  She stopped seeing Dr. Good in 2012 when she moved with her mother and siblings to Alabama.   Once in Alabama, she lived with her mother and siblings.  She began to receive regular psychiatric care from Dr. Kira Fonbah, who noted that the claimant's depressive episodes were "triggered by interpersonal interactions with family members."  (Tr. at 383).   In conjunction with her treatment from Dr. Fonbah, Ms. Jablonski also visited Patricia

_____

[2]       The claimant does not make any assertion in this appeal that the ALJ failed to properly assess her sleep apnea, asthma, or obesity, and she does not argue that she is disabled as a result of those physical impairments.

Cornett, Ph.D., for psychotherapy sessions, in which she often described her desire to return to school and to live independently, as well complaining of arguments with her mother. (Tr. at 389-400). When Dr. Cornett left UAB, Ms. Jablonski was referred to, and had one appointment with, Adrian Thurstin, Ph.D. In March of 2013, Dr. Thurstin described Ms. Jablonski as having "significant conflicts" with her mother and siblings "as well as other people." (Tr. at 402).

Between March 17 and June 13, 2013, there are no records that Ms. Jablonski received any therapy or medical treatment. On June 14, 2013, however, she was admitted to UAB Hospital after she called 911 and reported that she was having a "nervous breakdown." (Tr. at 432). The hospital visit apparently was precipitated by a confrontation with her mother. Ms. Jablonski reported severe depression and anger, and said she had attempted suicide at age 11 and again in 2012.[3] She was admitted for in-patient psychiatric treatment. She remained at the hospital for six days, during which her depressive symptoms improved. Ms. Jablonski's mother told the hospital staff during her hospitalization that she would not allow her daughter to return to live her with because of conflicts Ms. Jablonski had with her siblings. Ms. Jablonski remained in the hospital for six days pending "assistance w/

---

[3] Ms. Jablonski apparently did not report any suicide attempts to other doctors, and generally denied suicidal ideations.

placement," and was then released to a residential living facility for adults with mental illness. (Tr. at 435, 461). Ms. Jablonski apparently resided in the program operated by the Jefferson-Blount-St. Clair Mental Health Authority ("JBS") in Birmingham after her discharge, but there are no records of her psychiatric treatment until she moved into another residential facility in Oneonta more than six months later.[4]

In January of 2014, she was admitted to the Stonebrook program in Oneonta, Alabama, which is a "supervised residential living arrangement." (Tr. at 422-24). She remained at JBS Stonebrook through the time of her hearing before the ALJ. While living in the Stonebrook apartment with a roommate, she received daily assistance with her medication, supervision with cleaning and maintaining her apartment, and sessions with a doctor and counselors.[5] She went to a gym twice a week to swim for exercise. About once a month, she received psychiatric treatment from Dr. Hain.

---

[4] Records of a residential intake found at Tr. 414-419 indicate that she was a resident at two other JBS mental health residential facilities, Wahouma and Southside, between June 2013 and January 2014.

[5] The intake form signed by Dr. Hain indicates that the JBS "staff will monitor client's daily level of functioning—that is, reality orientation, personal hygiene, social interactions, affect appropriateness—and give feedback that either redirects or reinforces [client's] progress." (Tr. at 423).

Dr. Hain apparently first saw Ms. Jablonski on January 28, 2014, a few days after she began living at Stonebrook. (Tr. at 428). He reported that she was "settling in, no problems reported." She denied problems, except "vague [auditory hallucinations]." (*Id.*) Ms. Jablonski "denied mood swings, euphoria, paranoia, insomnia, IS, HI, violent urges, med SEs."[6] (*Id.*) Dr. Hain reported the Ms. Jablonski had a "casual, appropriate appearance," "good eye contact," was "alert, calm, cooperative, cheerful," did not appear to be responding to internal stimuli, and had goal-directed thought processes. (*Id.*) He made no changes to her medication. (*Id.*)

Dr. Hain saw Ms. Jablonski again a month later, on February 25, 2014, when he reported she had "settled in without difficulty," "denied problems, though says she may be hearing some vague AH," and again reported that she "denied mood swings, euphoria, paranoia, insomnia, IS, HI, violent urges, med SEs." He described her as "alert, calm, cooperative [and] cheerful." She reported occasional migraines, for which he recommended she be referred to a primary care physician.

---

[6]　The court presumes that the doctor's references to "SI" and "HI" are references to suicidal ideations or homicidal ideations. His reference to "med SEs" are presumed to refer to side effects of medication. It further appears that "IS" is a reference to internal stimuli. (<u>*Compare*</u> tr. at 428 *to* tr. at 425 - 27).

Dr. Hain indicated that a follow-up visit would occur in a month. (Tr. at 427). He made no changes to her medication. (*Id.*)

Dr. Hain next saw the claimant on March 18, 2014, when he reported that she "has been a little down with decreased energy which she blames on being upset by an issue regarding her mother." (Tr. at 426). He further reported that she enjoys "interactions with peer bridger, socializes with peers, and enjoys doing art work." (*Id.*) He again reported that she was denying "mood swings, euphoria, paranoia, insomnia, IS, HI, violent urges, med SEs" and that she had a "casual, appropriate appearance," "good eye contact," was "alert, calm, cooperative, cheerful," and did not appear to be responding to internal stimuli. (Tr. at 426). Again, he made no change to her medication. (*Id.*)

Dr. Hain's next visit with Ms. Jablonski was about six weeks later, on May 2, 2014. He reported that "[n]o problems" had been reported by the patient or staff, and that she "denied mood swings, euphoria, paranoia, insomnia, SI, HI, violent urges, med SEs." (Tr. at 425). Dr. Hain again reported that Ms. Jablonski had a "casual, appropriate appearance," "good eye contact," was "alert, calm, cooperative, cheerful," and did not appear to be responding to internal stimuli. (*Id.*)

In June of 2014, Dr. Hain completed a Mental Health Source Statement in which he indicated that Ms. Jablonski had "marked" limitations in the following areas:

The ability to maintain attention and concentration for extended periods.

The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

The ability to sustain an ordinary routine without special supervision.

The ability to work in coordination or proximity to others without being distracted by them.

The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

The ability to interact appropriately with the general public.

The ability to accept instructions and respond appropriately to criticism from supervisors.

The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

The ability to set realistic goals or make plans independently of others.

(Tr. at 474-75).

After the ALJ denied Ms. Jablonski's application for benefits, her attorney submitted a letter dated September 4, 2014, from Dr. Hain and Stewart Evans, a counselor from Stonebrook. (Tr at 476). The letter stated that Ms. Jablonski had been "compliant with all Rules and Regulations" at Stonebrook, and had been taking her medications as prescribed. The letter further stated, in part:

> While at Stonebrook, Ms. Jablonski's moods have fluctuated dramatically and her medications are continuing to be fine tuned. She has complained at times of visual, auditory and tactile hallucinations. We have seen her sobbing hysterically and depressed to euthymic. Primary issues have especially been her Father's emotional and physical abuse, the family dysfunction, her feelings of abandonment by her Mother, her lack of social network, and support, especially after moving to Birmingham and her sexual abuse at an early age.
>
> The environment at Stonebrook in Oneonta is very supportive of those with severe mental illness. Ms. Jablonski has had the support of nursing staff full time, 3 shifts of mental health technicians, the Program Coordinator, the Clinical Coordinator and a Treatment Team consisting of the Psychiatrist, the Primary Therapist, a behavioral analyst and a certified Peer Bridger that all see her at least once a month if not more.
>
> Notwithstanding that Ms. Jablonski was able to hold a job for three years several years ago[,] during the seven months that she has been in this program she has displayed emotional instability that would not be compatible with employment.

(Tr. at 476-77). Attached to the letter was a list of medications given at Stonebrook on an "as needed" basis, which included being given an anti-anxiety medication, lorazepam (1 mg), on eighteen occasions during the seven months preceding the letter.

**B.  Treating Physician's Assessment**

The claimant asserts that the Commissioner failed to give proper weight to the opinion of her treating psychiatrist, Dr. Hain, who has opined in a Medical Source Opinion ("MSO") that Ms. Jablonski has "marked" limitations in several areas, and that her emotional instability is not "compatible" with employment. The ALJ gave Dr. Hain's MSO assessment little weight, stating that the physician's statements regarding Ms. Jablonski's "marked" limitations were inconsistent with his treatment notes. (Tr. at 95).

Under prevailing law, a treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 1997)(internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other

things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). "Good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) ... was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) citing *Lewis*, 125 F.3d at 1440; *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)(holding that "good cause" exists where the opinion was contradicted by other notations in the physician's own record).

In this case, the opinion expressed in Dr. Hain's MSO is inconsistent with his own records. The ALJ noted that Dr. Hain consistently recorded that Ms. Jablonski was making good progress. While the ALJ spoke in that generality and did not give specific references to Dr. Hain's notes, the doctor's notes are summarized herein and support a finding that Ms. Jablonski was functioning well at Stonebrook. None of his treatment notes called for an increase or change in medication or for an increase or change in counseling sessions. None of his notes

include any reference to the "marked" limitations that he notes in the MSO, and he specifically stated that she has had no problems reported either by the patient herself or by the staff that supervise her daily.

Plaintiff argues that an assessment of her functioning within the confines of a mental health program does not equate to an assessment of her ability to function in the workplace. This point is well taken, in that the well-controlled environment of a residential program may provide extra stability for an otherwise unstable patient. However, Dr. Hain simply never noted that Ms. Jablonski had any problems of any kind except that she may have heard "vague auditory hallucinations." In every treatment note, he reported that she was "alert, calm, cooperative, [and] cheerful." The records do not reflect that Ms. Jablonski's condition worsened or deteriorated in any way after her brief hospitalization. To the contrary, the general assessment of her condition indicates that Ms. Jablonski was stressed by her family situation and that, once she was removed from that living arrangement, she improved.

Opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner;" thus the court "may not decide facts anew, reweigh the evidence, or substitute [its]

judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The court instead looks to the doctors' evaluations of the claimant's condition and the medical consequences thereof, not their opinions of the legal consequences of [her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, because it is the ALJ who bears the responsibility of assessing a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1546(c). In this case, the ALJ carefully reviewed the treating physician's records and heeded the *medical* opinions therein. It is only the opinion regarding Ms. Jablonski's capacity to do work that was given little weight. The ALJ clearly articulated "good cause" for the limited weight she gave to Dr. Hain's disability assessment; therefore, the ALJ did not err in failing to give the treating physician's opinion more weight.[7]

---

[7] Although plaintiff did not make the argument that the ALJ improperly failed to re-contact Dr. Hain or seek further medical information, the court considered that possibility. It is well settled that such a duty arises only where the evidence is insufficient to make a disability decision. *Shaw v. Astrue*, 392 Fed. App'x 684, 688-89 (11th Cir. 2008). In this case, there was no finding that the medical evidence was inadequate or incomplete, but simply that the medical evidence did not support the claim of disability. The duty to re-contact does not arise simply because the ALJ accords the evidence limited weight. 20 C.F.R. § 404.1520(b).

**D.  Additional Evidence**

Finally, the claimant asserts that the Appeals Council failed to adequately consider the new evidence presented on appeal—the letter from Dr. Hain and Mr. Evans.  (Tr. at 476-77).  The Appeals Council, however, recited that it considered the "additional evidence" and found it did not "provide a basis for changing" the ALJ's decision.  (Tr. at 2).  As the Commissioner points out, the letter is completely inconsistent with the medical records.  While the letter asserts that Ms. Jablonski's "moods have fluctuated dramatically" and that her medications are "continuing to be fine tuned," there is no evidence from any of the records that she behaved in the erratic manner described while under Dr. Hain's care.  In addition, the doctor's notes indicate that her medications were never increased, decreased, or changed in any way.  In fact, while she had lorazepam available to her "as needed" for anxiety, she took that pill only 18 times over the course of almost nine months. Moreover, the letter's reference to "sexual abuse at an early age" is not supported by any of her medical records.  Over the years of Ms. Jablonski's therapy and a hospitalization, she did report that her father had been verbally and emotionally abusive to her, but she never reported any sexual abuse.

While the ALJ could have considered the letter when it was offered, it is insufficient to support a finding that Ms. Jablonski is disabled and that the ALJ's determination was not supported by substantial evidence. The Appeals Council properly denied review because, even considering the letter, the ALJ's decision was supported by substantial evidence and comports with the statutes and regulations. Accordingly, the Appeals Council did not err in denying Ms. Jablonski's request for review.

## IV.    Conclusion

Upon review of the administrative record, and considering all of Ms. Jablonski's arguments, the Commissioner's decision is due to be and hereby is AFFIRMED and the action is DISMISSED WITH PREJUDICE. A separate judgment will be entered.

DATED the 27th day of June, 2017.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE